# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____
                                        )
**GENESIS HEALTH VENTURES,**            )
**INC.,**                               )
                                        )
      **Plaintiff,**   )
                                        )
      **v.**           )     **Civil Action No. 10-00381 (ESH)**
                                        )
**KATHLEEN SEBELIUS,**                  )
**Secretary of Health and Human Services,** )
                                        )
      **Defendant.**    )
_____)


## <u>MEMORANDUM OPINION</u>

Plaintiff Genesis Health Ventures, Inc. ("Genesis"), on behalf of thirty (30) skilled

nursing facilities it either owns or manages ("Providers"), brings this action against defendant

Kathleen Sebelius, Secretary of Health and Human Services ("Secretary"), to reverse a final

decision of the Provider Reimbursement Review Board ("Board") as to Providers' Medicare

reimbursements for fiscal year 1996. The Board's decision affirmed the fiscal intermediary's

decision to disallow Providers' allocation of nursing administration costs based on both nursing

and therapy salaries, as opposed to only nursing salaries, thereby reducing Providers' aggregate

Medicare reimbursements by $390,685.00. Plaintiff challenges the Board's decision under the

Administrative Procedures Act ("APA"), 5 U.S.C. §§ 701-706, as arbitrary and capricious and

not supported by substantial evidence. In the alternative, plaintiff contends that the Secretary is

equitably estopped from rejecting its method for allocating nursing administration costs. Before

the Court are the parties' cross-motions for summary judgment. As explained herein, the Court

will grant defendant's motion and deny plaintiff's motion.

**BACKGROUND**

I.    **STATUTORY AND REGULATORY BACKGROUND**

   A.    **The Medicare Act**

Title XVIII of the Social Security Act, commonly known as the Medicare Act, establishes a federal program of health insurance for the elderly and disabled.  42 U.S.C. § 1395 *et seq.*; *Thomas Jefferson Univ. v. Shalala*, 512 U.S. 504, 506 (1994).  Part A of Medicare provides "Hospital Insurance Benefits."  42 U.S.C. § 1395c.  It authorizes payments to "providers of services," 42 U.S.C. § 1395g, including skilled nursing facilities such as Providers, 42 U.S.C. §§ 1395x(u), for their "reasonable costs" of furnishing "covered services."  42 U.S.C. §§ 1395c, 1395d, 1395f(b), 1395g(a), 1395i, 1395x(v)(1)(A).  The "reasonable cost" of a service is "the cost actually incurred, excluding therefrom any part of incurred cost found to be unnecessary in the efficient delivery of needed health services."  42 U.S.C. § 1395x(v)(1)(A).  The Secretary, through the Centers for Medicare and Medicaid Services ("CMS"), administers the Medicare statute and is responsible for issuing regulations further defining reasonable costs and for determining reimbursement amounts.  *Thomas Jefferson Univ.*, 512 U.S. at 506–07 (citing 42 U.S.C. § 1395x(v)(1)(A) (reasonable costs "shall be determined in accordance with regulations establishing the method or methods to be used, and the items to be included, in determining such costs for various types or classes of institutions, agencies, and services")).  Such implementing regulations must "(i) take into account both direct and indirect costs of providers of services . . . in order that, under the methods of determining costs, the necessary costs of efficiently delivering covered services to individuals covered by the insurance programs established by this subchapter will not be borne by individuals not so covered, and the costs with

respect to individuals not so covered will not be borne by such insurance programs, and (ii) provide for the making of suitable retroactive corrective adjustments where, for a provider of services for any fiscal period, the aggregate reimbursement produced by the methods of determining costs proves to be either inadequate or excessive."  42 U.S.C. § 1395x(v)(1)(A).

### B.  Determining "Reasonable Costs"

As directed by the Medicare Act, the Secretary has adopted implementing regulations which further define the term "reasonable cost," 42 C.F.R. §§ 413.1(a)(1)(i)(C), 413.9(b)[1]  In addition, the Secretary has issued a Provider Reimbursement Manual, which contains "guidelines and policies to implement Medicare regulations which set forth principles for determining the reasonable cost of provider services."  Centers for Medicare and Medicaid

---

[1]42 C.F.R. § 413.9(b) defines "reasonable cost" as follows:

> (1) Reasonable cost. Reasonable cost of any services must be determined in accordance with regulations establishing the method or methods to be used, and the items to be included. The regulations in this part take into account both direct and indirect costs of providers of services. The objective is that under the methods of determining costs, the costs with respect to individuals covered by the program will not be borne by individuals not so covered, and the costs with respect to individuals not so covered will not be borne by the program. These regulations also provide for the making of suitable retroactive adjustments after the provider has submitted fiscal and statistical reports. The retroactive adjustment will represent the difference between the amount received by the provider during the year for covered services from both Medicare and the beneficiaries and the amount determined in accordance with an accepted method of cost apportionment to be the actual cost of services furnished to beneficiaries during the year.

*Id*.;  *see also* 42 C.F.R. §413.1(b) ("Regulations implementing [statutory definition of reasonable costs] are found generally in this part beginning at § 413.5.").

Services, Provider Reimbursement Manual, pt. 1 ("Reimbursement Manual"), Foreword, at I.[2]

The Reimbursement Manual's interpretive rules "do not have the force and effect of a statute or regulation," but do bind fiscal intermediaries. *Id.*; *see Catholic Health Initiatives v. Sebelius*, 617 F.3d 490, 491 (D.C. Cir. 2010) (citing 42 U.S.C. § 1395h).

### 1.    Cost Finding

For fiscal year 1996, skilled nursing facilities such as Providers obtained reimbursement for their "reasonable costs" by submitting a "cost report"[3] to a "fiscal intermediary," an entity contracted by the Secretary to coordinate billing by and payments to providers.  42 U.S.C. § 1395h (2003) (repealed by Medicare Prescription Drug, Improvement, and Modernization Act of 2003 ("2003 Medicare Act"), § 911, Pub. L. No. 108-173, 117 Stat. 2066)[4]; 42 U.S.C. § 1395x(v)(1)(A); 42 C.F.R. § 413.1; 42 C.F.R. § 413.20.  Through a complex process known as "cost-finding," a provider is able to recover both the direct and indirect costs of treating Medicare beneficiaries.[5]  *See* Reimbursement Manual § 2306.  "Cost-finding" starts from the premise that "[d]epartments within a provider are usually divided into two types:" (1)

---

[2]The Reimbursement Manual is publicly available at http://www.cms.gov/Manuals/PBM. CMS Publication 15-1 contains Part 1 (Chapters 1-30, §§ 100-3006) and CMS Publication 15-2 contains Part 2 (Chapters 1-41, §§ 100-4195).

[3]The cost report submitted by a provider "is a lengthy document consisting of numerous schedules, worksheets, and supplemental worksheets" which, "when completed, is approximately three-quarters of an inch thick."  *Athens Cmty. Hosp., Inc. v. Schweiker*, 743 F.2d 1, 3 (D.C. Cir. 1984).

[4]Pursuant to the 2003 Medicare Act of 2003, "fiscal intermediaries" are now known as "medicare administrative contractors."  42 U.S.C. § 1395kk-1.

[5]"Cost finding" is generally defined as "the process of recasting the data derived from the accounts ordinarily kept by a provider to ascertain costs of the various types of services furnished."  42 C.F.R. § 413.24(a) & (b)(1).

departments "that produce patient care revenue (e.g., routine services, radiology)," referred to in a cost report as a "revenue-producing cost center," and (2) departments "that do not directly generate patient care revenue but are utilized as a service by other departments (e.g., laundry and linen, dietary)," referred to in a cost report as a "non-revenue producing cost center."

Reimbursement Manual, pt. 1, § 2306. "Cost-finding" recognizes that:

> Although nonrevenue-producing cost centers do not directly produce patient care revenue, they contribute indirectly to patient care revenue generated by "serving" as a service to the revenue-producing centers and also to other nonrevenue-producing centers. Therefore, for the purpose of proper matching of revenue and expenses, the cost of the revenue-producing centers includes both its direct expenses and its proportionate share of the costs of each nonrevenue-producing center (indirect costs) based on the amount of services received.

*Id.* Nursing administration constitutes another "nonrevenue-producing cost center."

### 2. Step-Down Method of Cost-Finding

The method of "cost-finding" used by Providers is known as the "step-down method." 42 C.F.R. § 413.24.[6] Using this method, a provider's first step is to assign all costs to "cost centers."[7] The next step is to allocate each of the "general service cost centers,"[8] one of which is

---

[6]The Reimbursement Manual includes a form (Form CMS-2540-96), detailed instructions, and worksheets for a skilled nursing facility to prepare a cost report using the step-down method of cost-finding. Reimbursement Manual, pt. 2, §§ 106, 3500-95. Section 3516 contains instructions for Worksheet A, and section 3524 contains instructions for Worksheets B, Part I, and B-1. Id. §§ 3516, 3524. The actual worksheets are located in section 3590. *Id.* § 3590, pp. 35-313 *et seq.* ("Worksheet A"), 35-329 *et seq.* ("Worksheet B"), 35-335 et seq. ("Worksheet B-1").

[7]Worksheet A is used to record the "balance of expense accounts from [a provider's] accounting books and records" by assigning costs to "cost centers." Reimbursement Manual, Part 2, §§ 3516, 3590.

[8]Each cost center is assigned to one of the following categories: "general service cost centers," "inpatient routine service cost centers," "ancillary service cost centers," "outpatient service cost centers," "other reimbursable cost centers," "special purpose cost centers," and "non-reimburseable cost centers." Worksheet A.

the "nursing administration" cost center,[9] to the other cost centers that receive those services.[10] Reimbursement Manual, pt. 2, § 3524. In order to "equitably allocate the expenses of the general service cost centers," there is a "recommended basis of allocation," also known as the "statistical base."[11] *Id.* For example, the recommended basis for allocating the "capital-related costs" cost center is "square feet," the recommended basis for allocating the "employee benefits" cost center is "gross salaries," and the recommended basis for allocating the "nursing administration" cost center is "direct nursing hours." (Administrative Record ["AR"] 36); Worksheet B-1.

The "statistical base" determines where the costs for a general service cost center are allocated. After allocating all the allowable costs to the appropriate cost centers,[12] the provider

_____

[9]The other "general service cost centers" are "capital-related costs – building & fixture"; "capital-related costs – movable equipment"; "employee benefits"; "administrative and general"; "plant operation, maintenance and repairs"; "laundry and linen service"; "housekeeping"; "dietary"; "central services and supply"; "pharmacy"; "medical records and library"; "social service"; "intern & residents (approved teaching program)"; and "other general service cost." *See* Worksheets A, B, & B-1.

[10]Worksheet B, Part I "provides for the allocation of the expenses of each general service cost center to those cost centers which receive the services." Reimbursement Manual, Part 2, § 3524.

[11]Because these costs are "indirectly allocable costs" – "not chargeable based on actual usage" – they "must be allocated on the basis of a statistical surrogate." Reimbursement Manual, pt. 1, § 2302.4(B). "Worksheet B-1 provides for the proration of the statistical data needed to equitably allocate the expenses of the general service cost centers on Worksheet B, Part I." *Id.*, pt. 2, § 3524.

[12]More specifically, the "step-down" method works as follows:

All costs of nonrevenue-producing centers are allocated to all centers that they serve, regardless of whether or not these centers produce revenue. The cost of the nonrevenue-producing center serving the greatest number of other centers, while receiving benefits from the least number of centers, is apportioned first.

(continued...)

6

apportions them between Medicare and non-Medicare patients so that the program reimburses the provider for only those costs attributable to Medicare beneficiaries.  *See* 42 C.F.R. §§ 413.50, 413.54.

### 3.    Changing the Allocation Basis

The Reimbursement Manual sets forth the procedures by which a provider may change the basis for allocating a cost center.  In relevant part, it provides that:

> When a provider wishes to change its statistical allocation basis for a particular cost center . . . because it believes the change will result in more appropriate and more accurate allocations, the provider must make a written request to its intermediary for approval of the change ninety (90) days prior to the end of that cost reporting period.  The intermediary has sixty (60) days from receipt of the request to make a decision or the change is automatically accepted.  The provider must include with the request all supporting documentation to establish that the new method is more accurate. . . .

> If a provider has requested a change in allocation bases, the provider must maintain both sets of statistics until an approval is granted.  If the request is denied, the provider reverts back to the previously approved methodology. If the provider has failed to maintain the statistics per the previously approved methodology, the fiscal intermediary may accept the previous year's statistics, if the prior year's statistics can be reasonably related to the current year's costs.  Otherwise, the incremental program costs associated with the unapproved change must be disallowed.  If the provider continues to use the unapproved statistics/methodology for the subsequent year, all costs and statistics will be disallowed for those cost centers affected by the unapproved change. This requirement will apply to all cost finding methods.

---

[12](...continued)
Following the apportionment of the cost of the nonrevenue-producing center, that center will be considered "closed" and no further costs are apportioned to that center.  This applies even though it may have received some service from a center whose cost is apportioned later. Generally, if two centers furnish services to an equal number of centers while receiving benefits from an equal number, that center which has the greatest amount of expense should be allocated first.

42 C.F.R. § 413.24(d)(1).

The intermediary's approval of a provider's request will be furnished to the provider in writing within sixty (60) days of receipt of the request. Where the intermediary approves the provider's request, the change must be applied to the cost reporting period for which the request was made and to all subsequent cost reporting periods unless the intermediary approves a subsequent request for change by the provider. . . .

. . . .

If a provider has submitted a cost report with a change in its allocation statistics and/or order of allocation without prior approval from its intermediary, the intermediary must reject the cost report. If the provider can prove that the change results in a more appropriate and more accurate allocation of cost, is supported by adequate auditable documentation, and meets all the other conditions of this chapter, the fiscal intermediary may accept the provider's change upon resubmission of the cost report, notwithstanding the lack of prior approval.

Reimbursement Manual, pt. 1, § 2313 ("Reimbursement Manual § 2313" or "§ 2313"); (AR at 12).

### C.    Reimbursement Process

On the basis of a provider's cost report, the fiscal intermediary issues a Notice of

Program Reimbursement – its final determination regarding the amount the provider should be

reimbursed for services rendered during the reporting period. 42 C.F.R. § 405.1803. If a

provider is dissatisfied with the intermediary's determination, it may appeal to the Board, the

administrative tribunal established to hear Medicare reimbursement disputes. 42 U.S.C. §

1395oo(a). The parties to such an appeal are the provider and the intermediary. 42 C.F.R. §

405.1843(a). If jurisdictional prerequisites are satisfied and the Board has the authority to decide

the matter at issue, the Board may hold a hearing and issue a decision either affirming,

modifying, or reversing a final determination of the intermediary. 42 U.S.C. § 1395oo(d). The

Board's decision is final unless the Secretary, on her own motion, reverses, affirms or modifies

it. *See* 42 U.S.C. § 1395oo(f).[13]  A provider dissatisfied with a decision of the Board (or the Secretary, if she reviews a Board decision) may seek judicial review of that decision by filing a civil action within 60 days of the date that notice of the final decision is received.  42 U.S.C. §1395oo(f)(1); 42 C.F.R. § 405.1877(b).

## II.    FACTUAL AND PROCEDURAL BACKGROUND

Prior to fiscal year 1990, Providers allocated nursing administration costs using the recommended "statistic" of "direct nursing hours," with the result that all nursing administration costs were allocated to "routine service cost centers."  *See supra* n.8; Worksheet B-1.  In 1989, though, plaintiff's senior vice-president in charge of cost reporting, Kenneth Kuhnle, met with the two representatives of plaintiff's then-fiscal intermediary, Aetna Insurance Company ("Aetna" or "Prior Intermediary"), seeking permission to change the allocation basis for the nursing administration cost center from "direct nursing hours" to nursing and therapy "salaries" in order to, as he later described it, reflect the reality that "nursing administration had hands-on responsibilities within the therapy group."  (AR 9 n.2, 13, 52.)  "Physical therapy," "occupational therapy," and "speech therapy" are all categorized as "ancillary service cost centers."  Worksheet B-1.

Kunhle made the request verbally and did not provide the Aetna representatives with any supporting documentation.  (AR 56.)  However, before he came to work for plaintiff in 1988, Kuhnle had been employed by Aetna in the early 1980's as an auditor for Beverly Enterprises, then the largest owner/operator of skilled nursing facilities in the United States, and from 1985 to

_____

[13]The Secretary has delegated his authority to review Board decisions to the Administrator of CMS.  *See Catholic Health Initiatives*, 617 F.3d at 493.

1988 by Beverly itself. (AR 51.) Kunhle's request stemmed in part from the fact that during the time he was employed by both Aetna and Beverly, Aetna, as Beverly's fiscal intermediary, had allowed Beverly to use therapy salaries in the allocation basis for nursing administration costs. (AR 51.) Kunhle, however, was not part of the actual discussion between Beverly and Aetna leading up to the use of therapy salaries or aware of what, if any, documentation Beverly submitted to support the change. (AR 54.) Kunhle only made his request verbally because the Aetna representative "'particularly hated having anything put in writing." (AR 56.) During that same meeting, the Aetna representatives, "[a]fter a little squirming . . . agreed" and told Kunhle "okay, we'll go with that." (AR 52.)

Based on Aetna's verbal approval (AR 13), Providers, beginning in fiscal year 1990, submitted cost reports with nursing and therapy salaries combined as the allocation basis for nursing administration costs.[14] (AR 53, 59.) For fiscal years 1990 to 1995, Aetna, who continued as Providers' fiscal intermediary, approved reimbursements based on that allocation basis and Providers were reimbursed accordingly.[15] (AR 53.) For fiscal year 1996, Providers again submitted cost reports allocating nursing administration costs based on nursing and therapy salaries. (AR 9.) However, plaintiff's new fiscal intermediary, Veritus Medical Services ("Veritus" or "Intermediary"), adjusted those reports by deleting therapy salaries from the allocation basis. (*See, e.g.*, AR 708-11 (Notice of Program Reimbursement Letter from Veritus Medicare Services to Genesis Health Ventures for Willimansett Center West, Aug. 5, 1998),

---

[14]As a result, nursing administration costs were allocated to both "routine service cost centers" and "ancillary cost centers." (AR 56.)

[15]Veritus did not reject the inclusion of therapy salaries for another sixteen of plaintiff's facilities. (AR 108-09.)

760-61 (Audit Adjustment Report for Willimansett Center West, Feb. 19, 1998). The basis for the adjustment was Veritus's view that nursing administration costs should never be allocated based on therapy salaries because physical, occupational, and speech therapy were "ancillary cost centers."[16] (AR 1525.) As a result of these adjustments, Providers' reimbursement amount decreased overall by approximately $390,685.00. (AR 9.)

On August 28, 1998, plaintiff appealed the Intermediary's adjustment to the Board, challenging "the Intermediary's failure to include salaries of therapists supervised by nurses in its calculation of reimbursement based on the nursing administration statistic." (AR 9, 2473.) More than ten years later, on July 15, 2009, the Board held a hearing.[17] (AR 43-155.) After supplemental briefing by both plaintiff and the Intermediary, the Board issued its decision on January 6, 2010, upholding the adjustment. (AR 14-15.)

The precise issue considered by the Board was "[w]hether the Intermediary's deletion of therapy costs from line 25, column 9 of Worksheet B-1 of the Providers' Medicare cost reports is

_____

[16]Although the Notices of Program Reimbursement and Audit Adjustment Reports did not specifically explain the basis for the adjustment, a letter from the Department's Chief, Financial Management Branch, to Veritus dated September 22, 1998, in response to a July 22, 1998 letter from Veritus, states that she agrees with Veritus that "Nursing Administration directly relates to routine care and not ancillary services; therefore skilled nursing facility providers should not be allocating Nursing Administration to Ancillary Therapy areas." (AR 1525.) The Administrative Record does not include the July 22 letter. (AR 112.)

[17]On September 24, 1998, the Board notified Genesis that its appeal had been assigned Case Number 98-3417G. (AR 2470.) On August 30, 1999, the Chairman of the Board notified Genesis that "the Group is now complete." (AR 2467.) On March 21, 2003, the Board set a briefing schedule and a tentative hearing date of April 2004. (AR 2465-66.) The record does not reflect any activity between August 30, 1999, and June 26, 2003. By letter dated June 26, 2003, Genesis notified the Board that it had appointed Louis J. Capozzi, counsel for the plaintiff in the pending case, as its official representative before the Board. (AR 2464.) The parties finished briefing as of January 1, 2004. (AR 2262-2448 (Final Position Papers of Intermediary and Providers)). On April 22, 2009, the Board set the hearing date. (AR 1586-88.)

proper and in accordance with Medicare cost reporting practices and procedures." (AR 8.) First,

relying on Reimbursement Manual § 2313, the Board found that Providers "did not properly

obtain approval to allocate nursing administration costs using therapy salaries" because "no

*written* request was made and no *written* approval was granted by the previous intermediary"

with the result that the Board "d[id] not have any specific information regarding the basis of the

Providers' request, if there was documentation to support the allocation, or what the previous

intermediary actually approved." (AR 13, 14.) The Board also noted that "[w]hile there was

testimony concerning the use of a similar statistic by Beverly, there is no documentation in the

record concerning Beverly's request for approval, any approval it obtained or exactly what it

reported on its cost reports." (AR 14.) Next, the Board held that in the absence of proper prior

approval pursuant to § 2313, "the burden is on the provider to demonstrate with sufficient

auditable documentation that nursing administration did in fact provide services to the therapy

department to justify the allocation."[18] (AR 13.) Considering the record before it, the Board

found that "Providers did not present sufficient auditable documentation to support their

allocation of nursing administration to therapy cost centers" because "other than providing [time

---

[18]The Board "disagree[d] with the Intermediary's argument that the allocation of nursing administration to ancillary departments *per se* violated the regulations and manual provisions." (AR 14.) The Board noted that "[t]here was considerable testimony in the record that the role of nursing administration has increased in nursing facilities and includes managing and providing services to ancillary cost centers, over and above the usual role of communication and coordination of care with other ancillary departments" and that "in a number of cases, it has considered whether providers had sufficient auditable documentation to support their allocation of nurse administration costs to ancillary departments." (AR 14 (citing *Sw. Nursing & Rehab. Ctr.*, No. 2001-D28, 2001 WL 599891 (P.R.R.B. May 11, 2001); *Christ the King Manor*, No. 2003-D10, 2003 WL 1735385 (P.R.R.B. Feb. 15, 2003); *Twining Village*, No. 2004-D19, 2004 WL 2584850 (P.R.R.B. Apr. 30, 2004); *Riverview Ctr. for Jewish Seniors*, No. 2008-D14, 2008 WL 2001888 (P.R.R.B. Jan. 23, 2008).)

studies] for one provider in the group," they "did not explain the nature of the time study so the Board could determine whether it in fact supported their contentions, or if similar documentation for other Providers in the group was available." (AR 14.) Accordingly, the Board affirmed the Intermediary's adjustment to Providers' fiscal year 1996 cost reports excluding therapy salaries from the allocation basis for nursing administration. (AR 14-15 ("The Intermediary's adjustment deleting therapy salaries from line 25, column 9 of Worksheet B-1 of Providers' Medicare cost reports was proper." ).)

On March 3, 2010, the Administrator of CMS declined to review the Board's decision, thereby rendering the Board's decision a final agency action. (AR 1.) On March 8, 2010, plaintiff filed this action seeking review of the Board's decision pursuant to 42 U.S.C. § 1395oo(f). (Compl., Mar. 8, 2010.) Both parties filed motions for summary judgment, which are now ripe for resolution.

## ANALYSIS

Plaintiff argues that the Board's decision should be reversed because: (1) it rests on a misinterpretation of Reimbursement Manual § 2313 that led it to erroneously conclude that plaintiff could not rely on the verbal approval of its prior fiscal intermediary; (2) there is sufficient auditable documentation in the record to support Providers' inclusion of therapy salaries in the allocation basis for nursing administration costs; (3) the Secretary may not treat providers inconsistently in determining Medicare reimbursements; or (4) the Secretary is equitably estopped from deleting therapy salaries from the allocation basis in Providers' fiscal year 1996 cost reports. As discussed herein, none of these arguments are persuasive.

# I.    STANDARD OF REVIEW

Judicial review of the Board's Medicare reimbursement decisions is governed by APA standards.[19]  *Thomas Jefferson Univ.*, 512 U.S. at 512 (citing 42 U.S.C. § 1395oo(f)(1)); *Tenet HealthSystems HealthCorp. v. Thompson*, 254 F.3d 238, 243-44 (D.C. Cir. 2001)).  Accordingly, the Board's decision may be set aside only if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" or "unsupported by substantial evidence." 5 U.S.C. § 706(2)(A), (E).  Under both the "arbitrary and capricious" and "substantial evidence" standards, the scope of review is narrow and a court must not substitute its judgment for that of the agency. *Motor Vehicle Mfrs. Ass'n v. State Farm Mutual Auto. Ins. Co.*, 463 U.S. 29, 43 (1983); *Gen. Teamsters Local Union No. 174 v. Nat'l Labor Relations Bd.*, 723 F.2d 966, 971 (D.C. Cir. 1983).  As long as an agency has "'examine[d] the relevant data and articulate[d] a satisfactory explanation for its action including a rational connection between the facts found and the choice made,'" a reviewing court will not disturb the agency's action.  *MD Pharm., Inc. v. Drug Enforcement Admin.*, 133 F.3d 8, 16 (D.C. Cir. 1998) (quoting *Motor Vehicle*, 463 U.S. at 43) (brackets in original); *Alpharma, Inc. v. Leavitt*, 460 F.3d 1, 6 (D.C. Cir. 2006).

To the extent that the Secretary's decision is based on the language of the Medicare Act the Court must defer to the Secretary's interpretation whenever it is "a permissible construction of the statute."  *Marymount Hosp., Inc. v. Shalala*, 19 F.3d 658, 661 (D.C. Cir. 1994) (citing

---

[19]Although this matter is before the Court on cross-motions for summary judgment, in a case involving review of a final agency action under APA, summary judgment serves as the mechanism for deciding, as a matter of law, whether the agency action is supported by the administrative record and is otherwise consistent with the APA standard of review.  *See Richards v. Immigration & Naturalization Serv.*, 554 F.2d 1173, 1177 & n.28 (D.C. Cir. 1977); *Ne. Hosp. Corp. v. Sebelius*, 699 F. Supp. 2d 81, 85-86 (D.D.C. 2010).

*Chevron, USA, Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 84-44); *HCA Health Servs. of Okla., Inc. v. Shalala*, 27 F.3d 614, 617 (D.C. Cir. 1994); (*see also* Pl.'s Mem. at 2 ("Where, as here, the applicable statute, 42 U.S.C. § 1395x(v)(1)(a) (defining 'reasonable cost') is silent, the Court affords deference to the Secretary's reasonable interpretation.") (citing *Chevron*, 467 U.S. at 843-44)). "In addition, [courts] must defer to the [Secretary's] reading of its own regulations, unless that reading is 'plainly erroneous or inconsistent with the regulation[s].'" *Tenet*, 254 F.3d at 243-44 (quoting *Auer v. Robbins*, 519 U.S. 452, 461 (1997)) (third brackets in original)*; see Thomas Jefferson Univ.*, 512 U.S. at 512 (court must give the Secretary's interpretation "controlling weight unless it is plainly erroneous or inconsistent with the regulation"). "[B]road deference is all the more warranted when, as [with Medicare], the regulation concerns 'a complex and highly technical regulatory program,' in which the identification and classification of relevant 'criteria necessarily require significant expertise and entail the exercise of judgment grounded in policy concerns.'" *Thomas Jefferson Univ.*, 512 U.S. at 512 (quoting *Pauley v. BethEnergy Mines, Inc*., 501 U.S. 680, 697 (1991)).

## II.   BOARD'S INTERPRETATION AND APPLICATION OF REIMBURSEMENT MANUAL § 2313

Plaintiff challenges the Board's interpretation and application of Reimbursement Manual § 2313 insofar as the Board held that the lack of a written request or written approval meant that Providers had not "properly obtained approval from its previous intermediary [Aetna] to change their allocation statistic." (AR 13.) Plaintiff asserts that § 2313 does not require a written request and written approval and, therefore, that Aetna's verbal approval was sufficient to establish "explicit prior approval" that a provider "should be able to rely on." (AR 13; *see also* Pl.'s Mem. at 6 ("lack of a written approval letter from Aetna for Plaintiffs' use of the salaries

15

statistic in this case therefore cannot deprive Plaintiffs of the benefits of such approval").)

Plaintiff's specific argument is that the Board's interpretation of § 2313 as requiring "written prior approval" is "inconsistent" with § 2313's "automatic approval" provision.  (Pl.'s Mem. at 6 ("The suggestion in the [Board]'s decision . . . that written approval is required is plainly inconsistent with the automatic approval provision approved by the Secretary.").)

Section 2313 does provide that:  "[t]he intermediary has sixty (60) days from receipt of the request to make a decision or the change is automatically accepted."  (AR 2421.)  However, it also states that "[t]he intermediary's approval of a provider's request will be furnished to the provider in writing within sixty (60) days of receipt of the request."  (*Id*.)  While there is a potential conflict between these two statements, that conflict does not mean that the Board's decision in this case is "inconsistent" with the "automatic approval provision."  What plaintiff overlooks is that "the request" referred to in the automatic approval provision clearly refers back to the immediately preceding sentence, which states that "the provider must make a *written request* to its intermediary for approval of the change."  (*Id*. (emphasis added).)  Thus, the text of § 2313 makes clear that the automatic approval provision can only be triggered after a provider submits "a written request to its intermediary for approval of the change" that "must include . . . all supporting documentation to establish that the new method is more accurate."  (*Id*.)

Here, as plaintiff concedes, there was no written request and no submission of supporting documentation.  (Pl.'s Mem. at 4; AR 51-56.)  Rather, its request to change the allocation basis was made verbally and verbally approved during a single meeting.  (AR 51-56.)  As plaintiff's verbal request could not have triggered § 2313's automatic approval provision, any conflict between the automatic approval provision and the statement that the intermediary's approval

"will be furnished in writing" does not undermine the Board's decision that "absent a written request and approval," Providers did not properly obtain approval in accordance with § 2313.

Accordingly, plaintiff's argument that the Board's interpretation and application of § 2313 should be rejected is not persuasive. And having accepted the Board's interpretation and application of § 2313, the Court concludes that plaintiff could not rely on Aetna's verbal approval, even if the record establishes that Aetna gave its "explicit prior approval" to the change.[20]

## III. AUDITABLE DOCUMENTATION SUPPORTING ALLOCATION

Plaintiff next purports to challenge the Board's finding that "the Providers did not present sufficient auditable documentation to support their allocation of nursing administration to therapy cost centers." (AR 14.) According to plaintiff, "[w]here, as here, Plaintiffs had Fiscal Intermediary approval for the use of the salary statistic, the only documentation the Secretary's instructions in § 2313 required Plaintiffs to maintain . . . was payroll information." (Pl.'s Mem. at 13.) Thus, plaintiff argues, "[t]he [Board]'s determination that [Providers] were required to maintain and did not have sufficient documentation other than payroll information is inconsistent with the prior approval of the salary statistic . . . ." (*Id.*)

_____

[20]Plaintiff also argues that § 2313 expressly "precluded [Providers] from using any other statistic to report their costs once Genesis was advised by Aetna that the salary statistic was approved and accepted its use in [Providers'] cost reports" (Pl.'s Mem. at 10), relying on the following language: "[w]here the intermediary approves the provider's request, the change must be applied to the cost reporting period for which the request was made and to all subsequent cost reporting periods unless the intermediary approves a subsequent request for change by the provider. Reimbursement Manual § 2313. However, this argument assumes that the Court agrees with plaintiff that Providers did obtain proper prior approval to change the allocation basis for nursing administration costs. Absent that approval, § 2313 certainly does not impose any obligation on a provider to continue using a changed allocation basis.

Although plaintiff characterizes this argument as a challenge to the Board's finding re auditable documentation, it essentially concedes that it did not maintain or present "auditable documentation." (*See* Pl.'s Mem. at 14 ("Since the Secretary's decision below confirms that Plaintiffs are entitled to rely on a Fiscal Intermediary's prior approval, Plaintiffs were entitled to rely on that approval as well to cease maintaining documentation to support any statistic other than the prior approved salary statistic.").) Rather, plaintiff seems to be arguing that Aetna's verbal approval, even though it did not comply with § 2313, excuses it from the auditable documentation requirement. The Court disagrees. Plaintiff's argument is nothing more than an attempt to make an end run around the fact that the auditable documentation requirement was triggered because of its failure to obtain proper approval pursuant to § 2313. In addition, to accept plaintiff's argument would render meaningless both § 2313 and the legal standard articulated by the Board, although plaintiff has directly challenged neither. Accordingly, the Court will not upset the Board's finding that plaintiff did not satisfy its burden.

## IV.     INCONSISTENT TREATMENT OF PROVIDERS

Plaintiff also challenges the Board's decision on the ground that other providers, including ones owned or operated by plaintiff, were allowed to allocate nursing administration costs based on therapy salaries. According to plaintiff, "[i]t is the essence of arbitrary and capricious action to apply the same language in a statute or regulation to mean one thing for one group of providers and a different thing for another group of the same providers." (Pl.'s Mem. at 15.) As plaintiff sees it, "[t]he Record is clear that, in this case, the Medicare Program is recognizing the prior approval granted by Aetna for the Genesis facilities in some cases but not in others, for 1990-1995, but not, for some 1996, while at the same time authorizing its use as

more accurate that the standard methodology for the more than 1,000 Beverly facilities from 1982-1997." (*Id.*)

It is certainly true that "[a]n agency must treat similar cases in a similar manner unless it can provide a legitimate reason for failing to do so." *Indep. Petroleum Ass'n of Am. v. Babbitt*, 92 F.3d 1248, 1258 (D.C. Cir. 1996). However, it is also true that "[t]here is no authority for the proposition that a lower component of a government agency may bind the decision making of the highest level." *Cmty. Care Found. v. Thompson*, 318 F.3d 219, 227 (D.C. Cir. 2003); *see Heckler v. Cmty. Health Servs. of Crawford Cnty., Inc.*, 467 U.S. 51, 64 (1984) (Secretary not bound by misrepresentations made by Medicare fiscal intermediary); *see also Howard Young Med. Ctr., Inc. v. Shalala*, 207 F.3d 437, 443 (7th Cir. 2000) ("we do not consider the Secretary to be bound by the stipulation entered into at the [Board] hearing by . . . counsel for the intermediary"); *Appalachian Reg'l Healthcare, Inc. v. Shalala*, 131 F.3d 1050, 1053 n.4 (D.C. Cir. 1997) ("the intermediary's position is not the Secretary's"). In addition, it is well-established that even if cases "'evince internal inconsistency at a subordinate level, the [agency] itself would not be acting inconsistently.'" *Cmty. Care Found.*, 318 F.3d at 227 (quoting *Amor Family Broad. Group v. FCC*, 918 F.2d 960, 962 (D.C. Cir. 1991) (brackets in original)). Indeed, if an intermediary finds coverage and pays a claim, there is never an administrative appeal, and the Secretary would have no knowledge of the intermediary's decision nor opportunity to review those actions.

Thus, there is a significant difference between inconsistent application of a cost reimbursement rule by fiscal intermediaries and inconsistent application of a rule by the

Secretary.  None of the cases cited by plaintiff focus on inconsistency at the intermediary level.[21]

On the contrary, the law is clear that inconsistency at the fiscal intermediary level is not

attributable to the Secretary.

## V.    EQUITABLE ESTOPPEL

Plaintiff's final argument is that the Secretary is equitably estopped from disallowing its

allocation of nursing administration costs to therapy cost centers.  "Estoppel is an equitable

doctrine invoked to avoid injustice in particular cases."  *Heckler*, 467 U.S. at 59.  Estoppel

against the government, while theoretically permissible,  is rarely justified.  *See id.* at 61 ("When

the Government is unable to enforce the law because the conduct of its agents has given rise to

an estoppel, the interest of the citizenry as a whole in obedience to the rule of law is undermined.

It is for this reason that it is well settled that the Government may not be estopped on the same

terms as any other litigant. ");[22] *ATC Petroleum, Inc. v. Sanders*, 860 F.2d 1104, 1111 (D.C. Cir.

---

[21]*See Mercy Catholic Med. Ctr. v. Thompson*, 380 F.3d. 142, 157 (3rd Cir. 2004) (rejecting the Secretary's interpretation of a regulation as set forth in an interpretive rule because it required the intermediary to apply the regulation in a "one-sided fashion"); *Huntington Hosp. v. Thompson*, 319 F.3d 74, 76 (2d Cir. 2003) (faulting agency for issuing two separate regulations construing the same act of Congress in a totally inconsistent manner); *Indep. Petroleum Ass'n*, 92 F.3d at 1260 (rejecting agency's interpretation of rule that in light of another rule that led to differing treatment of similar cases without any legitimate reason); *Walter O. Boswell Mem'l Hosp. v. Heckler*, 749 F.2d 788, 799 (D.C. Cir. 1984) (addressing standard to be applied in reviewing agency promulgated rule interpreting Medicare statute: "It would be arbitrary and capricious for HHS to bring varying interpretations to the statute to bear [in allocating costs to Medicare] depending on whether the results helps or hurts Medicare's balance sheets . . . ."); *New England Coal. on Nuclear Pollution v. Nuclear Regulatory Agency*, 727 F.2d 1127, 1130 (D.C. Cir. 1984) (rejecting Nuclear Regulatory Commission rule that was not supported by accompanying statement of basis and purpose); *Squaw Transit Co. v. United States*, 574 F.2d 492, 496 (10th Cir. 1978) (faulting agency for "not apply[ing] the criteria it has announced as controlling.").

[22]In *Heckler*, the Supreme Court rejected the government's request to "expand this

(continued...)

1988) (doctrine's "application to the government must be rigid and sparing"). Indeed, neither the Supreme Court nor our Court of Appeals has ever upheld an estoppel claim against the Government "for the payment of money." *See Office of Personnel Mgmt. v. Richmond*, 496 U.S. 414, 427 (1990); *see ATC Petroleum Inc.*, 860 F.2d at 1111.

At a minimum, "[a] party attempting to apply equitable estoppel against the government must show that '(1) there was a definite representation to the party claiming estoppel, (2) the party relied on its adversary's conduct in such a manner as to change his position for the worse, (3) the party's reliance was reasonable[,] and (4) the government engaged in affirmative misconduct.'" *Keating v. Fed. Energy Regulatory Comm'n*, 569 F.3d 427, 434 (D.C. Cir. 2009) (quoting *Morris Commc'ns, Inc. v. FCC*, 566 F.3d 184, 191-92 (D.C. Cir. 2009)). According to plaintiff, this standard has been satisfied because (1) its prior fiscal intermediary, Aetna, made a definite representation that plaintiff could allocate nursing administration costs based on nursing and therapy salaries; (2) it detrimentally relied on that representation in ceasing to maintain documentation to support the use of that statistic and, therefore, lacked the documentation to support its use in the cost report for fiscal year 1996; (3) its reliance was reasonable because it knew that other providers, in particular Beverly, had obtained approval and had been using

---

[22](...continued)
principle into a flat rule that estoppel may not in any circumstances run against the Government," stating that "[w]e have left the issue open in the past, and do so again today." *Heckler*, 467 U.S. at 60. The Court explained that "[t]hough the arguments the Government advances for the rule are substantial, we are hesitant, when it is unnecessary to decide this case, to say that there are no cases in which the public interest in ensuring that the Government can enforce the law free from estoppel might be outweighed by the countervailing interest of citizens in some minimum standard of decency, honor, and reliability in their dealings with their Government." *Id.* at 61-62; *see Office of Personnel Mgmt. v. Richmond*, 496 U.S. 414, 426 (1990) (again declining to accept the government's "argument for an across-the-board no-estoppel rule").

therapy salaries in the allocation basis for years and because its cost reports using that statistic from 1990 to 1995 were all accepted and approved; and (4) the government's conduct was misleading because Aetna "required" it to make its request verbally and to accept verbal approval.  While it is undisputed  that Aetna gave its verbal approval to the change in allocation basis for nursing administration costs and that plaintiff detrimentally relied on that representation, plaintiff's estoppel claim nonetheless fails because it cannot establish that its reliance was reasonable.[23]

To show reasonable reliance, a party seeking estoppel must show that it "did not know nor should it have known that its adversary's conduct was misleading."  *Heckler*, 467 U.S. at 59 (citation omitted).  Plaintiff describes its detrimental reliance as follows:

> The Government conduct at issue --- the Fiscal Intermediary's approval and continuing approval after audit of their uses of the salaries statistic for allocation --- induced Plaintiffs to change its position with respect to maintenance [of] documentation. As authorized under § 2313, based on Aetna's confirmation of prior approval for the use of the salary statistic,  Plaintiffs maintained only those records required to support their allocations of Nursing Administration costs based on that statistic, since, as confirmed by the auditors witnesses from both sides below, that was all that was required by the Secretary's instructions to support such allocations at audit. That change of position is sufficient to show detrimental reliance necessary for equitable estoppel because the data now being required by the [Board] decision, as confirmed in the auditors' testimony below, cannot be created retroactively.

(Pl.'s Mem. at 18-19.)  Thus, the question for the Court is whether plaintiff's decision to cease maintaining records to support the change in allocation in light of Aetna's verbal approval of the change was reasonable.

---

[23]Plaintiff has also failed to establish the fourth element of estoppel: "affirmative misconduct" by the government.  *Keating v. FERC*, 569 F.3d at 434.  The record here is devoid of any evidence that could support such a finding.

One obvious problem with plaintiff's argument is that it cites § 2313 to support its contention that Aetna had the authority to approve the change. However, as discussed above, plaintiff did not properly obtain approval pursuant to Reimbursement Manual § 2313. In addition, the fact that Aetna did not require plaintiff to comply with section 2313, indeed "insisted" that the request be made verbally, does not change the well-established rule that a provider is presumed to have knowledge of the Reimbursement Manual's requirements and understand the role of a fiscal intermediary. *Heckler*, 467 U.S. at 64 ("[a]s a participant in the Medicare program, [the provider] had a duty to familiarize itself with the legal requirements for cost reimbursement" and "[s]ince it also had elected to receive reimbursement through [a fiscal intermediary], it also was acquainted with the nature of and limitations on the role of a fiscal intermediary.") Indeed, the Supreme Court held in *Heckler* that "[t]he fact that [a fiscal intermediary's] advice was erroneous is, in itself, insufficient to raise an estoppel . . . ." *Id.*; *see also id.* at 64-65 ("As a recipient of public funds well acquainted with the role of a fiscal intermediary, [the provider] knew [its fiscal intermediary] only acted as a conduit; it could not resolve policy questions. The relevant statute, regulations, and Reimbursement Manual, with which respondent should have been and was acquainted, made that perfectly clear.")

As explained by the Supreme Court in *Heckler*, "[t]here is simply no requirement that the Government anticipate every problem that may arise in the administration of a complex program such as Medicare; neither can it be expected to ensure that every bit of informal advice given by its agents in the course of such a program will be sufficiently reliable to justify [reliance]." *Id.* at 64. This is especially true where the advice received from a fiscal intermediary is oral:

> It is not merely the possibility of fraud that undermines our confidence in the reliability of official action that is not confirmed or evidenced by a written

instrument. Written advice, like a written judicial opinion, requires its author to reflect about the nature of the advice that is given to the citizen, and subjects that advice to the possibility of review, criticism, and reexamination. The necessity for ensuring that governmental agents stay within the lawful scope of their authority, and that those who seek public funds act with scrupulous exactitude, argues strongly for the conclusion that an estoppel cannot be erected on the basis of the oral advice that underlay respondent's cost reports. That is especially true when a complex program such as Medicare is involved, in which the need for written records is manifest.

*Id.* at 65.

The present case is indistinguishable from *Heckler.* Plaintiff relied on its fiscal intermediary's representation that a verbal request and approval was sufficient to change an allocation basis, despite the clear language in § 2313 to the contrary. Thus, its decision to rely on that advice in deciding not to maintain records to support its allocation was not reasonable. *See also Swedish Am. Hosp. v. Sebelius*, No. 08-2046, 2011 WL 1120093, at *8 (D.D.C. Mar. 29, 2011) (no estoppel "[b]ecause the [provider]'s reliance on [its fiscal intermediary's advice] was unreasonable"); *Bradley Mem'l Hosp. v. Leavitt*, 599 F. Supp. 2d 6, 15 (D.D.C. 2009) (provider's decision "to rely on statements made by the [fiscal] intermediary's employees cannot now be blamed on the Secretary"). Thus, absent a showing of reasonable reliance, plaintiff's estoppel claim cannot succeed.

## CONCLUSION

Accordingly, and for the reasons stated above, the Board's decision to uphold the fiscal intermediary's adjustment of Providers' allocation of nursing administration costs by deleting therapy salaries from the allocation basis is affirmed. A separate Order will grant defendant's

motion for summary judgment and deny plaintiff's motion for summary judgment.


_____/s/_____
ELLEN SEGAL HUVELLE
United States District Judge

Date:   July 22, 2011